Janis M. WILSON, and Gerard G. Richardson, in behalf of themselves and others similarly situated, Plaintiffs-Appellants,

v.

John R. THOMPSON, Individually and in his official capacity as solicitor of the State Court of DeKalb County, Defendant-Appellee.

No. 76–4356.

United States Court of Appeals, Fifth Circuit.

May 1, 1979.

Rehearing and Rehearing En Banc Denied June 1, 1979.

Joseph H. King, Jr., John R. Myer, Atlanta, Ga., for plaintiffs-appellants.

Wendell K. Willard, E. C. Harvey, Jr., Decatur, Ga., for defendant-appellee.

Before BROWN, Chief Judge, and TUTTLE and THORNBERRY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The plaintiffs seek preliminary injunctive relief against the continued prosecution of criminal proceedings against them in the Georgia state courts. They allege that the proceedings were brought in bad faith, in that they were brought in retaliation for, and to deter them from, the exercise of their First Amendment right to petition for redress of grievances. After a hearing the District Judge ruled that the doctrine of *Younger v. Harris*, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, precluded a federal court from enjoining a state criminal prosecution brought in bad faith unless the plaintiffs show that they are threatened with repeated or multiple prosecutions. The plaintiffs having failed to make that showing, he denied their request for a preliminary injunction. We reverse and hold that a state prosecution undertaken in retaliation for or to deter the exercise of constitutionally protected rights may be enjoined regardless of whether the criminal defendant is threatened with repeated or multiple prosecutions. But because certain fact issues relevant to the determination of whether to grant interim relief were not resolved by the District Court, we remand.

## I

This is an appeal from the denial of a preliminary injunction, a fact that has seemingly escaped the notice of both the plaintiffs and the defendant. Our summary of the facts thus reflects the testimony adduced at the hearing for a preliminary injunction. Three witnesses testified: John R. Thompson, Solicitor of the State Court for DeKalb County and defendant in this

case; Judge Jack B. Smith, a judge on the State Court for DeKalb County; and Jay Lawrence, a reporter for the Atlanta *Constitution.*

## A

On December 5, 1974, plaintiffs Gerard Richardson and Janis Wilson[1] were involved in an altercation with two DeKalb County Deputy Sheriffs, Ronald E. Davis and J. L. Cheek. The deputies were attempting to arrest Richardson on civil contempt charges for nonpayment of alimony. Blows ensued—though it does not appear that anyone was seriously injured—and the identity of the aggressor is in sharp dispute. In any event, the deputies arrested Richardson and Wilson. They charged Richardson with two counts of simple battery and Wilson with one count of battery and one count of interfering with a peace officer in the performance of his duties. All of these charges are misdemeanors under Georgia law.

A preliminary hearing on the charges against Richardson and Wilson was held on February 5, 1975, and the cases were bound over to the State Court for DeKalb County. The State Court has jurisdiction over misdemeanor criminal cases, of which it handles some 1,300 per month. In normal circumstances the cases would have come to trial in the late winter or early spring of 1975. For some reason that is not apparent from the record, however, the cases were held, and no further action was taken on them until October 1, 1975. On that date Judge Smith entered separate orders placing the cases against Richardson and Wilson on the "dead docket." Each of these orders stated:

> It appearing to the court that the above stated defendant was placed on voluntary probation due to *insufficient evidence* and having served said probation to the satisfaction of the court, whereupon said case be and the same is hereby ordered placed on the Dead Docket.

---

1. During the pendency of this appeal Janis Wilson married her co-plaintiff and became Janis Richardson. For the sake of convenience, we shall refer to her by her maiden name.

These orders were form orders, the only typewritten portion being the italicized words "insufficient evidence."

### B

Title 24–2714 of the Georgia Code provides the statutory authority for the maintenance of a dead docket. It states:

It is the duty of the clerks of the superior court—

5. To keep in their offices, in vacation, and in court during term time, the following dockets and books, to-wit:

(7) A docket of criminal cases, to be known as the dead docket, to which cases shall be transferred at the discretion of the presiding judge, and which shall only be called at his pleasure. When a case is thus transferred, all witnesses who may have been subpoenaed therein shall be released from further attendance until resubpoenaed.

The case law concerning how the dead docket is supposed to work is sparse and largely uninformative, but Judge Smith and Solicitor Thompson testified concerning its operation in their court. Their testimony established that the State Court for DeKalb County used to maintain two files for inactive cases: the dead docket and the "hold file." The relationship between these two files prior to their consolidation in mid–1975 is somewhat unclear from the testimony. The hold file was apparently used in connection with DeKalb County's unique system of "voluntary probation," an invention of Judge Smith's colleague on the State Court, Judge Mitchell. The system was explained by Judge Smith by means of a hypothetical. He gave a case involving a 17–year-old high school boy charged with his first offense as a case appropriate for placement in the hold file. Such a case would be held, and if the boy served the "term" of his "voluntary probation" without incident, the case would be placed on the dead docket and never prosecuted. But if, in Judge Smith's words, the boy "went right out and commit[ted] the same thing

again," the case would be removed from the hold file and placed on the trial calendar.

As typical of other cases appropriate for placement in one of the inactive files, Judge Smith and Solicitor Thompson mentioned charges arising out of a nonserious neighborhood or matrimonial dispute which the prosecuting witness later decides not to pursue. Both Judge Smith and Solicitor Thompson testified, however, that should the prosecuting witness change his mind and ask that the charges be prosecuted, the case would usually be removed from the inactive files and set for trial. Judge Smith stated, for example, that cases were generally revived at the request of the prosecuting witness "unless there is some good reason not to." His reason for this practice, he testified, is his belief that "criminal cases should be handled out in the courtroom and not handled in somebody's office unless the State and the defendant both agree that the case should be handled that way" and unless the interested parties—the defendant, the State, and the prosecuting witness—are content with that resolution.

### C

In mid–1975, according to Judge Smith, he and Judge Mitchell decided that the maintenance of two separate inactive files was unnecessary in view of recent Georgia case law establishing that cases on the dead docket were "still pending" and could be placed on the trial calendar.[2] In July or August of 1975, therefore, they directed the Solicitor "to end the hold file and to get all cases either activated or placed on the dead docket." The October 1, 1975 orders placing the cases against Richardson and Wilson on the dead docket, Judge Smith testified, were entered pursuant to this direction, and the reference in those orders to the defendants "having served said voluntary probation to the satisfaction of the Court" was in fact meaningless boilerplate.

Judge Smith also testified that the notation "insufficient evidence" did not necessarily mean that anyone had made a deter-

---

2. *See, e. g., Courtenay v. Randolph,* 1972, 125 Ga.App. 581, 188 S.E.2d 396, discussed in Part I.D *infra.*

mination that there was insufficient evidence to prosecute. Indeed, the plaintiffs have conceded, both below and on this appeal, that based on the testimony the deputies gave at the preliminary hearing, the State had sufficient evidence to go to trial and to sustain a jury verdict of guilt.

### D

On February 11, 1976, Janis Wilson filed a civil damage suit against the two deputies in the Superior Court of DeKalb County. This suit was in two counts. The first count alleged that the deputies "did, without justification, violently batter plaintiff," and sought general damages of $5,000 and punitive damages of $50,000. The second count alleged that the deputies arrested Wilson and caused her to be incarcerated, without probable cause and knowing that she had not committed an assault, and sought special damages of $1,000, general damages of $15,000, and punitive damages of $100,000.

The deputies were not served in the civil suit until July 6 and 7, 1976. On July 7, they went to see Judge Smith. Judge Smith testified that the officers told him they had been sued for "malicious abuse of process" and that they inquired about the status of the criminal action against Wilson. Judge Smith did not remember the case and took the two deputies to the office of Solicitor Thompson. Thompson pulled the file and ascertained that the case had been placed on the dead docket. According to both Smith and Thompson, Judge Smith then told Thompson to reactivate the charges against Wilson.

Judge Smith testified that his conduct was influenced by a recent case out of the Georgia Court of Appeals, *Courtenay v. Randolph,* 1972, 125 Ga.App. 581, 188 S.E.2d 396, and the proceedings following it. In *Courtenay,* the Georgia Court of Appeals held that "Placing of a case upon the dead docket constitutes neither a dismissal nor a termination of the prosecution in the accused's favor." The Court dismissed Randolph's action for malicious prosecution because the criminal charge against him remained on the dead docket and thus had not been finally determined. Following the

Court of Appeals' decision, Randolph asked Judge Mitchell, Judge Smith's colleague on the State Court for DeKalb County, to remove the criminal action against him from the dead docket and to schedule it for trial. Judge Mitchell refused, whereupon Randolph brought a mandamus action in the Superior Court of DeKalb County. *Randolph v. Mitchell,* Civil Action No. 82209. Judge Mitchell relented and ordered the case reactivated before decision in the mandamus proceedings.

According to Judge Smith, his reason for ordering Wilson's case removed from the dead docket was his belief that the parties involved were dissatisfied with its remaining there. He knew, of course, that the deputies were dissatisfied, and he assumed that Wilson too was dissatisfied since, under *Courtenay,* a malicious prosecution action cannot proceed while the criminal case remains on the dead docket. To avoid getting involved in a mandamus proceeding like Judge Mitchell did following *Courtenay,* and because he believed the parties to be "unhappy," Judge Smith testified, he ordered the case against Wilson reactivated.

Solicitor Thompson testified that he reactivated the case against Richardson on his own. His stated reason was that Richardson's case was a "companion case" to Wilson's and "I did not think it fair to reactivate one and not reactivate the other."

Shortly after the reactivation of the criminal charges against Wilson and Richardson, Thompson and Judge Smith were interviewed regarding the cases by a reporter from the Atlanta *Constitution,* Jay Lawrence. Lawrence subsequently wrote a newspaper article entitled "Suit Resurrects Dropped Charges," which was published in the July 20 *Constitution.* The article credited Judge Smith with saying that the reason he ordered the Wilson case reactivated was that "Ms. Wilson's lawsuit indicated everybody was not happy." Judge Smith testified that this was a substantially accurate summary of his statements to Lawrence. Lawrence also wrote, and affirmed in testimony at the hearing, that Solicitor Thompson told him that the criminal prosecutions "would probably" be dropped if the civil suit was dropped and that the civil suit

was a factor "but not a controlling factor" motivating the decision to revive the criminal prosecutions. At the hearing Thompson admitted that the "not a controlling factor" language was his own, but placed the remark in the context of his speculating as to Judge Smith's motives in ordering the Wilson case reactivated. Thompson also testified that "the rest of the information in this article arose from a discussion of Mr. Lawrence asking me general hypothetical questions and me answering them in many generality type situations. And Mr. Lawrence, in my opinion, came to the wrong conclusions and the wrong deductions in several instances in here."

### E

Solicitor Thompson reactivated the criminal charges against Wilson and Richardson by drawing up new accusations on July 7. He testified that he drew up new accusations rather than orders taking the cases off the dead docket for reasons of administrative convenience. The cases were set for the July trial calendar. Thompson then called Joseph King, Wilson's attorney of record in the civil suit, and informed him that the cases had been scheduled for trial.

Mr. King was not listed as an attorney of record in the criminal cases.

On July 19, the plaintiffs filed this § 1983 action seeking to enjoin Solicitor Thompson from continuing or threatening to continue the criminal prosecutions and seeking damages of $5,000 general and $100,000 punitive. The complaint alleged that Solicitor Thompson reinstituted the criminal actions "for the sole purpose of depriving, attempting to deprive, and otherwise interfering with the rights of plaintiff Janis M. Wilson to seek redress of her grievances in the Superior Court of DeKalb County."[3] On July 24, the District Court granted the plaintiffs' motion for a temporary restraining order. A hearing on their motion for preliminary injunction was held on July 26, at the conclusion of which the District Judge rendered oral findings and denied the requested relief. He did, however, grant the plaintiffs' request for a stay of the state court proceedings pending the conclusion of this appeal. The District Judge entered a written order denying the preliminary injunction on November 19, 1976.

### II

In the proceedings below, the plaintiffs conceded the prima facie applicability of the doctrine of *Younger v. Harris, supra,*[4]

3. The plaintiffs also sought to maintain a class action on behalf of "all former, present, and future defendants in cases placed on the dead docket of the State Court of DeKalb County who were or may be threatened with continued prosecution for pursuit of claims of civil relief." They sought an injunction against Solicitor Thompson restraining him from "initiating, commencing, recommencing, reinitiating, continuing, or otherwise utilizing criminal prosecutions, or the threat of criminal prosecutions, as a means to discourage litigants from seeking redress of civil grievances." No class has been certified, nor have any hearings on the propriety of class certification been held. The sole issue before us is the propriety of preliminary injunctive relief against the Wilson and Richardson prosecutions.

4. *Younger v. Harris,* 1971, 401 U.S. 37, 91 S.Ct. 46, 27 L.Ed.2d 669, held that, absent extraordinary circumstances, a federal court is precluded from enjoining a pending state criminal prosecution. The Court relied on "traditional principles of equity jurisprudence," among them the principle that an injunction will not be granted where the plaintiff has an adequate remedy at law—the opportunity to present his

federal claims in the state court—and on the notion of federal/state comity—"a proper respect for state functions . . . and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." 401 U.S. at 43–45, 91 S.Ct. at 750. In *Huffman v. Pursue, Ltd.,* 1975, 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482, the Court described four comity concerns implicated when a federal court enjoins state criminal proceedings:

[I]nterference with a state judicial proceeding prevents the State not only from effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies. Such interference also results in duplicative legal proceedings, and can readily be interpreted "as reflecting negatively upon the state courts' ability to enforce constitutional principles."

*See generally* Redish, *Younger v. Harris: Deference in Search of a Rationale,* 63 Cornell L.Rev. 463 (1978).

but argued that they were nonetheless entitled to an injunction against the state criminal proceedings under the "bad faith or harassment" exception to *Younger.* The District Judge based his denial of the plaintiffs' request for a preliminary injunction on their failure to show a threat of repeated or multiple prosecutions. Since absent such a threat, he reasoned, the issue of bad faith or harassment "can be decided once and for all in a single criminal case," [5] the plaintiffs would not suffer irreparable injury if an injunction were denied—while they would have to endure the inconvenience and ignominy of a criminal proceeding, that is not the sort of "great and irreparable" injury the *Younger* Court required as a predicate to federal injunctive relief.

█ The District Judge erred. As the defendant virtually conceded at oral argument, his stated principle—that the *Younger* bad faith exception applies only when there is a threat of repeated or multiple prosecutions—simply cannot be sustained. Nearly every Supreme Court case addressing the bad faith exception has described it in terms which indicate that it is not limited to situations of repeated or multiple prosecutions. *Younger* itself distinguished *Dombrowski v. Pfister,* 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, an earlier case which had held that an injunction against the enforcement of certain state criminal statutes should have been granted, on the ground that "[t]here is no suggestion that this single prosecution against Harris is brought in bad faith *or* is only one of a series of repeated prosecutions to which he will be subjected." 401 U.S. at 49, 91 S.Ct. at 753 (emphasis supplied). The use of the disjunctive has been repeated in other cases. *See, e. g., Perez v. Ledesma,* 1971, 401 U.S. 82, 85, 91 S.Ct. 674, 27 L.Ed.2d 701; *Kugler*

*v. Helfant,* 1975, 421 U.S. 117, 124, 95 S.Ct. 1524, 44 L.Ed.2d 15. Our cases as well have recognized that the bad faith exception is not limited to situations where there is a threat of multiple or repeated prosecutions. *See, e. g., Shaw v. Garrison,* 5 Cir., 1972, 467 F.2d 113, 122, *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317; *Duncan v. Perez,* 5 Cir., 1971, 445 F.2d 557, *cert. denied,* 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 254. *Cf. Kolski v. Watkins,* 5 Cir., 1977, 544 F.2d 762 (requiring *Younger* abstention in a single prosecution case, but examining question of bad faith); *Stewart v. Dameron,* 5 Cir., 1971, 448 F.2d 396, after remand, 1972, 460 F.2d 278 (remanding for hearing on bad faith in single prosecution case).

While he announced the principle that the *Younger* bad faith or harassment exception encompasses only those situations in which the federal plaintiff is threatened with multiple or repeated prosecutions, the District Judge's reasoning suggests that he may have had something different in mind. His opinion might be read to hold simply that the plaintiffs had not shown irreparable injury—that is, as not holding that, as a matter of law, federal intervention is absolutely precluded in a single prosecution case, but rather as finding that, on the facts as developed at the hearing, the plaintiffs had failed to make the necessary showing. The notion underlying such a holding would be that the opportunity to raise the defense of bad faith prosecution in the state courts is presumptively an adequate remedy and that federal intervention is not warranted unless the plaintiff demonstrates that for some reason this remedy is inadequate.

But even if interpreted in this fashion, the District Judge's opinion cannot be sustained. While the notion that irreparable injury must be established independently of bad faith has some inferential support in the case law,[6] we think it an inaccurate

---

**5.** This assumes that the issue of bad faith or harassment could be raised as a defense in the state proceedings, an assumption apparently shared by the plaintiffs and the defendant. Although we are not entirely sure that this assumption is warranted—but see *Fitzgerald v. Peek,* Civ. Action No. C–77–2074A (N.D.Ga. 1978), in which Judge O'Kelley states that a claim of bad faith prosecution can be raised in the Georgia courts through a motion to quash the indictment—the discussion in this part of

the opinion assumes that the defense could be raised. For a discussion of why, in the circumstances presented here, it does not make any practical difference whether the defense could be raised, see text and note at n. 17, *infra.*

**6.** For example, *Younger* specifically stated that:

   Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution,

reading of the *Younger* precedents and a distortion of the *Younger* policies, at least as respects the kind of bad faith prosecution alleged here.[7]

■ *Shaw v. Garrison,* 5 Cir., 1972, 467 F.2d 113, 120, *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317, unequivocally established that "a showing of a bad faith [prosecution] is equivalent to a showing of irreparable injury for purposes of the comity restraints defined in *Younger.*" In *Shaw,* we affirmed the issuance of an injunction against a perjury prosecution brought against Clay Shaw, a New Orleans businessman, by Jim Garrison, the District Attorney for the Parish of Orleans.[8] Although we observed that the record would have supported an inference that Shaw was threatened with additional prosecutions, we found it "unnecessary to go beyond the bad faith nature of the perjury prosecution to affirm the judgment." 467 F.2d at 114. Admitting that *Younger* held the necessity of undergoing a state criminal prosecution in order to vindicate one's federal rights insufficient in and of itself to establish irreparable injury such as to justify federal intervention,[9] we emphasized that the Court based this holding on the principle that "[n]o citizen or member of the community is immune from prosecution, *in good faith,* for

his alleged criminal acts." 401 U.S. at 46, 91 S.Ct. at 751 (emphasis supplied), quoting *Watson v. Buck,* 1941, 313 U.S. 387, 400, 61 S.Ct. 962, 85 L.Ed. 1416. We therefore read the Court's *Younger* opinion as implicitly recognizing that a suit to enjoin a state criminal prosecution brought in bad faith is of a different breed than a suit to enjoin a prosecution brought lawfully and in good faith.

■ The reason for distinguishing, for *Younger* purposes, between a suit to enjoin a good faith prosecution and a suit to enjoin a bad faith prosecution is that the interests of both the criminal defendant and the State differ significantly from those relied on by the Court in *Younger*[10] when the injunction is sought against a state prosecution brought in bad faith.[11] With respect to the criminal defendant, he is seeking to protect his federal "right not to be subjected to a bad faith prosecution or a prosecution brought for purposes of harassment, [a] right [that] cannot be vindicated by undergoing the prosecution." *Shaw, supra,* 467 F.2d at 122 n.11. The *Younger* doctrine presumes that "the only constitutional issue at stake is the validity of the challenged state law—that *being prosecuted* under an arguably (or actually) invalid law is not itself a violation." *Developments in the*

---

could not by themselves be considered "irreparable" in the special legal sense of that term.
401 U.S. at 46, 91 S.Ct. at 751. *See also Milner v. Burson,* 5 Cir., 1972, 470 F.2d 870.

7. Bad faith can take many forms, and our remarks are directed to the type of bad faith prosecution alleged here—that of a prosecution undertaken under a valid statute for constitutionally impermissible reasons.

8. Shaw sued for both damages and injunctive relief. Before trial on damages, however, Shaw died. This circumstance eventually resulted in the Supreme Court's holding, in *Robertson v. Wegmann,* 1978, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (Wegmann being Shaw's executor), that state law determines the survivorship of actions brought under § 1983. The Supreme Court referred to our 1972 *Shaw* decision in its description of the litigation's history, and noted:
The Court of Appeals held that this Court's decision in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), did not bar the enjoining of the state perjury prosecu-

tion, since the District Court's "finding of a bad faith prosecution establishes irreparable injury both great and immediate for purposes of the comity restraints discussed in *Younger.*" 467 F.2d at 122.
436 U.S. at 586 n.2, 98 S.Ct. at 1993 n.2.

9. See note 6, *supra.*

10. *See* note 4, *supra.*

11. These differences were succinctly summarized by Justice Stewart in his *Younger* concurrence:
In such circumstances [i. e., bad faith] the reasons of policy for deferring to state adjudication are outweighed by the injury flowing from the very bringing of the state proceedings, by the perversion of the very process that is supposed to provide vindication, and by the need for speedy and effective action to protect federal rights.
401 U.S. at 56, 91 S.Ct. at 757. The discussion following is largely an exposition of this analysis.

*Law—Section 1983 and Federalism,* 90 Harv.L.Rev. 1133, 1286 (1977) (emphasis in original). That presumption does not obtain when the *prosecution itself* effects the constitutional violation. *See Sheridan v. Garrison,* 5 Cir., 1969, 415 F.2d 699, *cert. denied,* 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed.2d 685. In *Sheridan,* we held that the Anti-Injunction Statute, 28 U.S.C.A. § 2283, did not bar federal injunctive relief against a state prosecution brought in bad faith to deter the exercise of First Amendment rights. Although the specific holding of *Sheridan* has been overtaken by more recent cases,[12] the policy undergirding that holding applies in full force here. We distinguished cases where the prosecution itself, as opposed to possible conviction and imprisonment under an invalid statute, constitutes the alleged constitutional violation. If the federal courts were precluded from enjoining the state proceedings in such cases, we stated,

> State officials disposed to suppress speech could easily do so by bringing oppressive criminal actions pursuant to valid statutes rather than by enacting invalid statutes or using other parts of the state legal machinery, and § 1983 would give no effective relief unless they happen to warn their victims in advance. In *Dombrowski* and cases of its nature,[13] the substance of the complaint is exactly this: that state officials are using or threatening to use prosecutions, *regardless of their outcome,* as instrumentalities for the suppression of speech.   .   .   .
>
> When a significant chilling effect on free speech is created by a bad faith prosecution, the prosecution will thus as a matter of law cause irreparable injury regardless of its outcome, and the federal courts cannot abstain from issuing an injunction.

415 F.2d at 706 (emphasis in original).

■ With respect to the interests of the State, it by definition does not have any legitimate interest in pursuing a bad faith prosecution brought to retaliate for or to deter the exercise of constitutionally protected rights.[14] Perhaps the most important comity rationale of *Younger* deference—that of respect for the State's legitimate pursuit of its substantive interests, see *Younger,* 401 U.S. at 51–52, 91 S.Ct. 746; *Trainor v. Hernandez,* 1977, 431 U.S. 434, 441, 97 S.Ct. 1911, 52 L.Ed.2d 486—is therefore inapplicable. In *Sheridan, supra,* we distinguished on similar grounds the holding of *Douglas v. City of Jeannette,* 1943, 319 U.S. 157, 165–66, 63 S.Ct. 877, 87 L.Ed. 1324 (a *Younger* precursor), that the necessity of undergoing a state criminal proceeding brought lawfully and in good faith does not amount to irreparable injury because there is no reason to assume "that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal to this [the Supreme] Court":

> When, however, the allegation upon which an injunction suit is based is that the state proceeding *itself* creates a chilling effect on speech because the state's legal machinery is being used in bad faith, it is precisely this assumption that is challenged, and to rely upon comity is to beg the question. The justification for comity disappears if the allegation is proved true.

415 F.2d at 707 (emphasis in original).

■ Thus, both precedent and policy indicate that irreparable injury is sufficiently established if the federal plaintiff demonstrates that the state prosecution against him was brought in bad faith for the purpose of retaliating for or deterring the exercise of constitutionally protected rights. We so hold.

---

**12.** *See Mitchum v. Foster,* 1972, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705.

**13.** We were of course referring to the bad faith aspects of *Dombrowski,* aspects not overruled by *Younger.*

**14.** To the extent that the State does have legitimate interests at stake in the prosecution, the question becomes whether the prosecution would have been otherwise brought but for the constitutionally impermissible motivation—a question of causation. *See* Part III *infra.*

## III

The principal focus of the arguments on this appeal has not centered on the correctness of the District Court's ruling that the plaintiffs need show a threat of multiple or repeated prosecutions in order to be entitled to injunctive relief, but rather on whether the evidence presented at the hearing on the preliminary injunction established that the state criminal proceedings were in fact reinstituted with the purpose of retaliating for or deterring the continuation of the civil law suit.[15] Seizing on the District Judge's findings in his written order that placement of the case on the dead docket "finalized the State's position that further prosecution would not be appropriate to vindicate its interests" and that "Solicitor Thompson caused the reinstitution of criminal proceedings against plaintiff Janis Wilson, and later plaintiff Gerard Richardson, solely in response to the continued prosecution of Ms. Wilson's civil claims in the Superior Court of DeKalb County," the plaintiffs contend that we should find bad faith as a matter of law. The defendant, on the other hand, points out that the District Court's written findings were prepared by the plaintiffs' attorney,[16] argues that those findings are clearly erroneous, and requests that we affirm the denial of the preliminary injunction because of the failure of the plaintiffs to present sufficient evidence to warrant a finding of bad faith. We decline to do either.

## A

Again, this is an appeal from the denial of a preliminary injunction. The grant or denial of a preliminary injunction is discre- tionary with the trial court and will be reversed only for abuse of discretion. *See Doran v. Salem Inn,* 1975, 422 U.S. 922, 932–34, 95 S.Ct. 2561, 45 L.Ed.2d 648; *Ealy v. Littlejohn,* 5 Cir., 1978, 569 F.2d 219, 235; *Buchanan v. United States Postal Service,* 5 Cir., 1975, 508 F.2d 259, 266. The four prerequisites for granting a preliminary injunction were set forth by this Court in *Canal Authority v. Callaway,* 5 Cir., 1974, 489 F.2d 567, 572:

(1) [A] substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

The District Court apparently felt that the plaintiffs had failed to show both irreparable injury and a likelihood of success on the merits. Irreparable injury will be sufficiently made out if the plaintiffs show a substantial likelihood of prevailing on the merits. Our problem is that the District Judge, perhaps because of his erroneous view of the controlling legal principles, did not determine the likelihood of the plaintiffs so prevailing, nor did he make sufficient factual findings for us to confidently say how he would have decided had he been operating under a correct view of the law.

## B

In order to show a likelihood of prevailing on the merits, the plaintiffs must show the likely applicability of the *Younger* bad faith exception and, what amounts to

---

**15.** Retaliation and deterrence, of course, are not the same thing, and we do not intend to treat them as synonymous. The plaintiffs have alleged that the misdemeanor prosecutions were revived for both purposes, however, and it is not necessary to distinguish between them for the purposes of this opinion.

**16.** In this Circuit the "clearly erroneous" rule of F.R.Civ.P. 52(a) applies to a trial judge's findings of fact whether he prepared them or they were developed by one of the parties and mechanically adopted by the judge. *James v. Stockham Valves & Fittings Co.,* 5 Cir., 1977, 559 F.2d 310, 314 n.1; *Volkswagen of America,*

*Inc. v. Jahre,* 5 Cir., 1973, 472 F.2d 557. However, we can take into account the District Court's lack of personal attention to factual findings in applying the clearly erroneous rule. *See James, supra; Louis Dreyfus and Cie. v. Panama Canal Co.,* 5 Cir., 1962, 298 F.2d 733. As we observed in *James,* " 'the appellate court can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered' when factual findings were not the product of personal analysis and determination by the trial judge." 559 F.2d at 314 n.1, *quoting Louis Dreyfus, supra,* 298 F.2d at 738.

the same thing in the circumstances of this case,[17] the likely existence of a constitutional violation causally related to the result sought to be enjoined. In determining the content of the required showing, we are guided by the Supreme Court's recent decision in *Mt. Healthy City Board of Education v. Doyle,* 1977, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471.

In *Mt. Healthy,* an untenured school teacher alleged that the defendant school board's decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms. Although the Supreme Court agreed with the District Court's conclusion that the First Amendment protected the teacher's conduct in communicating to a local radio station the subject of his principal's memorandum on teacher dress and appearance, it reversed an award of reinstatement and back pay. The District Court had predicated the grant of relief on its finding that the protected conduct played a "substantial part" in the decision not to rehire. But focusing solely on whether protected conduct played a "substantial part" in the State's decision, the Supreme Court stated, "could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." The end result might well be to prevent the school board from fairly evaluating the school teacher's performance record, an "undesirable consequence" of some concern in cases where, as was true in *Mt. Healthy,* the decision to rehire will accord tenure. Since "the constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct," the Court announced the following as "the proper test to apply in the present context":

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

429 U.S. at 287, 97 S.Ct. at 576.

We think a similar test should be applied when a federal plaintiff seeks to enjoin a state prosecution allegedly brought in retaliation for or to deter the plaintiff's exercise of constitutionally protected rights. The constitutional principle at stake—the right to pursue one's constitutional rights free from state interference or retaliation—is essentially the same. The factual inquiry—whether the State has impermissibly considered constitutionally protected conduct in reaching a decision to take some action adverse to the plaintiff—is similar. And, even more so than was the case in *Mt. Healthy,* a healthy respect for the interests of the State counsels caution lest we adopt principles whose application might result in unnecessary interference with the State's pursuit of its legitimate goals.

■ In one respect, however, we think it necessary to depart somewhat from the test as articulated in *Mt. Healthy. Mt. Healthy* stated that the plaintiff need show only that the constitutionally protected conduct

17. Where the allegation is that the state proceedings, though brought under a valid statute, were instituted in retaliation for or to deter the exercise of constitutionally protected rights, the question of the applicability of the *Younger* exception and that of the existence of a constitutional violation merge: to prove one is to prove the other. For this reason, it is not necessary for us to determine whether the plaintiffs could raise their bad faith prosecution claim in the state proceedings, see note 5, *supra,* although the opportunity to raise the federal claim in the state court is generally a requirement of *Younger* abstention. *See Trainor v. Hernandez,* 1977, 431 U.S. 434, 441, 97 S.Ct. 1911, 1917, 52 L.Ed.2d 486 (the doctrine of *Younger* noninterference "naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issue involved"); *Gibson v. Berryhill,* 1973, 411 U.S. 564, 577, 93 S.Ct. 1689, 36 L.Ed.2d 488. Whether or not *Younger* technically applies, the plaintiffs must make the same showing in order to be entitled to injunctive relief.

was a motivating factor in the decision not to rehire, whereupon the burden shifts to the defendant to show that it would have reached the same decision even absent the protected conduct. As transposed to the context of a suit to enjoin criminal proceedings allegedly brought to retaliate for or to deter the pursuit of civil remedies, this formulation would require the plaintiff to show that the institution of the civil lawsuit was a motivating factor in the decision to bring criminal proceedings, whereupon the burden would shift to the State to show that it would have brought the prosecution even absent the civil lawsuit. So formulated, however, this test does not recognize or take into account that the State may have any number of legitimate reasons for responding to a civil lawsuit by bringing a criminal prosecution.[18] It is only when the State's purpose in bringing criminal proceedings is to retaliate for or to deter the prosecution of the civil lawsuit that the civil plaintiff's constitutional rights are violated. The mere fact that the State responded to the civil lawsuit does not make out the constitutional violation; retaliatory or deterrent purpose is an essential element.

We do not think that the Supreme Court in *Mt. Healthy* intended to, or did, speak to the allocation of the burden of proving that the motive underlying the State's response was constitutionally infirm. For one thing,

the Court stated that it was announcing "the proper test to apply in the present context." The context there, of course, was that of a schoolteacher dismissed for making protected statements to the press, a context in which the mere fact of response *does* make out the constitutional violation.[19] Moreover, *Mt. Healthy's* principal focus is on the appropriate test "which distinguishes between a result caused by a constitutional violation and one not so caused." Its rule shifting the burden of proof to the defendant applies only after the constitutional violation has been proved and the defendant is seeking to prove that the decision now attacked would have been reached even absent the constitutional violation. *See Givhan v. Western Line Consolidated School District*, 1979, —— U.S. ——, 99 S.Ct. 693, 58 L.Ed.2d 619.

■ In resolving this burden of proof problem, we turn to the cases dealing with the analogous problem of determining whether a State decision was motivated by a discriminatory purpose. In cases where proof of a constitutional violation requires proof of discriminatory purpose, the burden of establishing the impermissible purpose has generally been placed on the plaintiff. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 1977, 429 U.S. 252, 270–71 & n.21, 97 S.Ct. 555, 50 L.Ed.2d 450;[20] *Washington v. Davis*, 1976,

**18.** This case may be an example of one in which the State responded to protected conduct, but the reason for that response was entirely innocent. *See* text and note at notes 23 and 24, *infra*; Judge Thornberry's special concurrence, post at 4603. See also *Hicks v. Miranda*, 1975, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223.

**19.** The purpose problem in *Mt. Healthy* was whether the State's decision not to rehire was made by reason of the plaintiff's exercise of protected rights or by reason of other, legitimate factors. That problem is an issue in this case. But our point is that this case presents an additional problem of a somewhat different nature: the problem that arises once it is clear that the State's decision was in fact in response to the plaintiff's exercise of protected rights and the question controverted is whether the State's reason for responding to the protected conduct was legitimate or constitutionally impermissible.

**20.** *Arlington Heights* and *Mt. Healthy* were decided the same day. In describing the plaintiff's burden in *Mt. Healthy* as including the showing that protected conduct was a "motivating factor" in the decision not to rehire, the Court cited *Arlington Heights*; in noting that proof of discriminatory purpose would not necessarily have required invalidation of the challenged state decision in *Arlington Heights*, but would simply have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered, the Court cited *Mt. Healthy*. This indicates, at least implicitly, that the Court viewed *Arlington Heights* as establishing the elements of the plaintiff's proof and *Mt. Healthy* as establishing the elements of the defendant's "same decision anyway" affirmative defense in cases where a state decision is attacked as motivated by a constitutionally impermissible purpose.

426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597; *Grigsby v. North Mississippi Medical Center*, 5 Cir., 1978, 586 F.2d 457, 460–61; *Williams v. DeKalb County*, 5 Cir., 1978, 582 F.2d 2. Thus, in the context of a suit to enjoin a criminal prosecution allegedly brought in retaliation for or to deter the protected conduct, we think that the plaintiff must show that an impermissible purpose—rather than, as stated in *Mt. Healthy*, the protected conduct—was a motivating factor in the decision to prosecute.[21] If the plaintiff shows that the State responded to his exercise of a constitutionally protected right by bringing the prosecution, he may of course rely upon an inference of impermissible purpose. The strength of this inference will depend upon the particular circumstances. If the State advances no other explanation for so responding to the conduct, for example, the inference will almost certainly carry the day. But this should not obscure the fact that the burden of proving impermissible purpose is on the plaintiff.

■ This discussion indicates that the proper test to be applied in the context of a suit to enjoin a criminal prosecution allegedly brought in retaliation for or to deter the exercise of constitutionally protected rights is as follows: The Court should consider whether the plaintiffs have shown, first, that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected, and, second, that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct. If the Court concludes that the plaintiffs have

successfully discharged their burden of proof on both of these issues, it should then consider a third: whether the State has shown by a preponderance of the evidence that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered.[22]

C

We cannot tell from the District Court's findings or this record what conclusion the Court would have reached regarding the plaintiff's likelihood of success had it applied this test. With respect to the first part of the test, we have no doubt but that the plaintiffs have successfully shown that Wilson's filing of the civil lawsuit was constitutionally protected conduct. It is by now well established that access to the courts is protected by the First Amendment right to petition for redress of grievances. See *NAACP v. Button*, 1962, 371 U.S. 415, 429–30, 83 S.Ct. 328, 9 L.Ed.2d 405; *California Motor Transport Co. v. Trucking Unlimited*, 1971, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642. However, there is no indication in the record that Richardson has filed or intends to file a civil lawsuit against the deputies. It may be that this is of no consequence because, in view of their relationship, the prosecution of Richardson will have a direct and deleterious effect on Wilson's protected conduct. But the trial judge did not address this issue, and we do not feel competent to decide it on this record.

**21.** As pointed out by Judge Thornberry in his special concurrence, placing the burden on the plaintiff accords with the traditional reluctance of federal courts to interfere in the state criminal process and reflects the strong State interests involved in the administration of the criminal law. Cf. *Dayton Bd. of Education v. Brinkman*, 1977, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (because "local autonomy of school districts is a vital national tradition. . . . case for displacement of local authorities by a federal court in a school desegregation case must be satisfactorily established by factual proof," *id.* at 410, 97 S.Ct. at 2770, including proof of "intentionally segregative actions on the part of the Board," *id.* at 413, 97 S.Ct. at 2772, citing *Washington v. Davis, supra*.). It is

also consistent with the presumption of regularity usually accorded the official acts of public officers. See *Dombrowski v. Pfister*, 1965, 380 U.S. 479, 484, 85 S.Ct. 1116, 14 L.Ed.2d 22; *United States v. Chemical Foundation*, 1926, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131.

**22.** Relevant to this determination would be such factors as whether the State prosecution was undertaken with no hope of a valid conviction, see *Perez v. Ledesma*, 1971, 401 U.S. 82, 85, 91 S.Ct. 674, 27 L.Ed.2d 701, and the significance of the alleged criminal activity. See *Duncan v. Perez*, 5 Cir., 1971, 445 F.2d 557, 560, cert. denied, 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 254.

■ Moreover, the application of the second part of the test also presents difficulties. The District Court found that the misdemeanor proceedings were brought "solely in response to" the filing of the civil lawsuit. But "solely in response to" and "motivated by a purpose to retaliate for or to deter" are not the same thing. Judge Smith's testimony that the prosecutions were revived because he believed the civil suit to include a malicious prosecution count,[23] for instance, is consistent with the finding that the criminal proceedings were reinstituted "solely in response to," but inconsistent with a finding of a purpose to retaliate or to deter.[24] On the other hand, the evidence was not so unequivocal as to require a finding that the plaintiffs had not shown that the misdemeanor prosecutions were impermissibly motivated. The testimony of Jay Lawrence, together with the comparative insignificance of the criminal charge,[25] supports the plaintiffs' allegations.

■ Finally, the only finding of the District Court relevant to the third part of the test—the finding that the placement of the cases against Wilson and Richardson on the dead docket constituted a determination that "further prosecution would not be appropriate to vindicate its [the state's] interest"—was based on the supposition that the dead docket order meant what it said—that is, that the plaintiffs had successfully served the term of their "voluntary probation." This supposition we find clearly erroneous on this record, see note 16, *supra*, in light of Judge Smith's uncontradicted testimony that the cases were moved from the hold file to the dead docket pursuant to his and Judge Mitchell's direction to consolidate the two inactive files.[26] *See* Part I.C, *supra*.

■ The question of bad faith under the test outlined above is largely a question of fact,[27] as are the determinations required in deciding whether to grant a preliminary injunction, and we refuse the parties' invi-

23. In a submission to this Court, the plaintiffs have described the second count of their civil complaint, see Part I.D *supra*, as alleging a claim for false arrest. Conclusion of the criminal proceedings is not a condition precedent to the maintenance of an action for false arrest. *See Conoly v. Imperial Tobacco Co.*, 1940, 63 Ga.App. 880, 12 S.E.2d 398. However, the plaintiffs' pleadings in the civil lawsuit are ambiguous and can fairly be read to allege either malicious prosecution or false arrest. Moreover, we do not think an injunction should issue if the criminal proceedings were reinstituted due to a mistake of fact on the part of Judge Smith and Solicitor Thompson. Of course, this is not to say that an injunction might not be appropriate should the prosecution continue after the State has been apprised that the factual basis for its reinstitution of the criminal charges was in error.

24. To be sure, the District Judge found that "with regard to Judge Smith, I find that he in fact merely referred the 'victims' (i. e., the deputy sheriffs) to Solicitor Thompson for whatever action the latter might think necessary to vindicate the state's interest." While we do not hold this finding to be clearly erroneous—and do not mean to foreclose the District Judge from finding the same on remand—we think for several reasons that the best course for us to take is a remand which leaves it open for fresh factfinding on this critical issue. First, the District Judge focussed his attention foremost on the effect of the *Younger* doctrine.

Second, the written findings were apparently prepared by the plaintiffs' attorney, see note 15, *supra*, and the District Judge made no finding on this issue in his oral decision. Finally, there is some indication in the comments made by the District Judge during the hearing that he thought Judge Smith, not Solicitor Thompson, the principal actor in ordering the prosecutions reactivated. *See* Transcript 73, 86, 105. *See also* Transcript 81, 86 (remarks of plaintiffs' attorney). In these circumstances we decline to put our imprimatur on the Court's written finding and will await his considered judgment on remand.

25. *See* note 22, *supra*.

26. We emphasize again that we have no intention of dictating the result on remand. It is open for the District Judge to find that the State has no legitimate interest in prosecuting these plaintiffs. We simply think that his previous finding to that effect is insupportable as it was based on what we perceive to be, on this record, an erroneous view of why the case was moved from the hold file to the dead docket.

27. *See Shaw v. Garrison*, 5 Cir., 1972, 467 F.2d 113, 122 (finding of bad faith not "clearly erroneous"), *cert. denied*, 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317; *Duncan v. Perez*, 5 Cir., 1971, 445 F.2d 557, 560 (same), *cert. denied*, 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 254.

tation to assume a role committed to the District Court. We therefore remand for further proceedings, either on this record or as supplemented by the parties under the initial direction of the District Court. On remand, the District Court should make specific factual findings in accordance with the standards set forth in this opinion.

REVERSED and REMANDED.

TUTTLE, Circuit Judge, concurring specially and dissenting in part:

I concur in that part of the decision of the Court which reverses the judgment of the trial court dismissing the action, but I respectfully dissent from that part of the Court's opinion outlining the posture of the case when it reaches the trial court for further consideration.

As indicated in the Court's opinion, the trial court incorrectly concluded that the *Younger* doctrine prevented the United States District Court from entertaining the plaintiffs' complaint in the absence of a threat of repetitive prosecutions in the state court. I fully agree that an exception to the *Younger* doctrine arises where allegations and proof demonstrate that a single state court prosecution is brought in bad faith.

My difference with the majority is that I am of the view that the trial court here intended to make findings of fact which would have required the granting of the preliminary injunction under the four way test outlined in the opinion, if the court had thought that a *Younger* exception could arise in a single prosecution.

The burden on a plaintiff to establish a bad faith prosecution is, of course, great. This may be properly so. It is also peculiarly difficult, because such proof requires a showing of the subjective purpose of the involved state official. I believe the Court's opinion here has erroneously added to the difficulties of establishing the plaintiffs' case in these respects: (1) it has ignored a finding of fact by the trial court that the action taken to reinstitute the criminal cases against Wilson and Richardson was the act of defendant Thompson and not of Judge Smith; and (2) it has unjustifiably

concluded the trial court's finding that the placement of the cases on the dead docket constituted a determination that "further prosecution would not be appropriate to vindicate [the state's] interest" was clearly erroneous.

(1) As the case appears here, there is the undisturbed finding of fact by the trial court "with regard to Judge Smith, I find that he in fact merely referred the 'victims' (*i. e.* the deputy sheriffs) to Solicitor Thompson for *whatever action the latter might think necessary to vindicate the state's interest*" (emphasis added). The significance of this finding is that we are not concerned with what Judge Smith may have testified to as his reason for approaching Thompson. It is only Thompson's motivation that can bear upon the issue of bad faith.

(2) I believe that this Court is wrong in ruling clearly erroneous the district court's finding that Judge Smith's order of October 1, 1975, placing the cases on the dead docket "finalized the state's position that further prosecution would not be appropriate to vindicate its interests." The Court bases its conclusion on Judge Smith's testimony that he placed the cases on the dead docket on October 1 to combine in one docket the cases that formerly were on the "hold" docket and the "dead" docket. This ignores Judge Smith's testimony that he directed Thompson that "[we were going] to end the hold file and . . . get all cases *either* activated *or* placed on the dead docket" (emphasis added). Thus, placing these cases on the dead docket when the hold file was closed reflected a choice not to prosecute the case.

The stated reasons for this choice in the order signed by Judge Smith placing the case on the dead docket were "insufficient evidence" and satisfactory service of "voluntary probation." The cases could be removed from the dead docket, but, according to both Judge Smith and Thompson, only upon some future contingency such as bad behavior or an effort by the defendant to activate the case. Neither of these occurred here. The majority characterizes this order as "boilerplate." This is unjustified. Judge Smith testified that he relied,

as many judges do, on the representations of the prosecutor and signed the order. The judicial parol evidence that he didn't pay attention to what he said does not warrant impeaching the order, much less finding the district court clearly erroneous in its finding as to the order's effect.

The district court concluded "that Solicitor Thompson caused the reinstitution of criminal proceedings against plaintiff Janis Wilson, and later plaintiff Gerard Richardson, solely in response to the continued prosecution of Ms. Wilson's civil claims in the Superior Court. It seems clear that there was no other motivation behind these criminal prosecutions." In light of the admitted statement by Thompson, as testified to by the newspaper reporter who interviewed him, that "criminal prosecutions probably would be dropped if the civil case were dropped" and the district court's finding that the state had no substantive interest in renewed prosecution of the plaintiffs, I am of the view that the court's finding that Thompson reactivated the prosecutions "solely in response to" the civil suit was tantamount to a finding of bad faith.

I believe, therefore, that on remand the court should be permitted to rely on the subsidiary findings I have discussed and make the finding whether the prosecutions were reactivated in good or bad faith without having to travel uphill over ground already covered.

THORNBERRY, Circuit Judge, specially concurring:

Despite the excellence of Judge Brown's opinion, the importance of this case compels me to add a few words of my own.

I write primarily to stress that although the *Younger* doctrine can possibly be neutralized in this case, the proper exercise of equitable power requires a careful balancing of interests,[1] and a reluctance to unnecessarily intrude in the state criminal process should properly weigh in the balance.[2] Unnecessary federal intrusions can be avoided if the district court scrupulously assures that plaintiffs carry the burden of showing that the constitutionally impermissible purpose was a motivating factor in the decision to prosecute.[3]

In the present case, the actions taken by Solicitor Thompson and Judge Smith[4]—allowing the charges to lapse and then reinstating them after inquiry from the complainants—appear to effect a proper accommodation of the competing interests involved in any criminal prosecution.[5] It is the addition of the suggestion of the impermissible motive to deter protected conduct[6]

1. Judge Brown focuses primarily on the first two requisites for issuing a temporary injunction. The district court should not fail to evaluate the remaining factors enunciated in *Canal Authority v. Callaway*, 489 F.2d 567 (5 Cir. 1974). In this case, however, to balance the relative detriments or to evaluate any disservice to the public interest may well be unnecessary if the district court determines that the prosecution was reopened in bad faith, since, in light of the *de minimis* nature of the purported criminal violation, the state would not have any strong interest to project into the balance.

2. This reluctance had been a tenet of federal equity jurisprudence long before taking on independent life as the *Younger* doctrine. *See generally* Soifer & Macgill, The *Younger* Doctrine: Reconstructing Reconstruction, 55 Texas L.Rev. 1141 (1977).

3. Requiring plaintiffs to prove impermissible motive in their prima facie case is, I believe, a proper adjustment in light of the dissimilarity in circumstances from *Mt. Healthy*. Although this change may impose a heavier burden on plaintiff, it recognizes that greater latitude is generally accorded state authorities in the pur-

suit of criminal prosecutions. *Cf. Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (reindictment on more serious charges permissible in plea bargaining context irrespective of vindictive motive). It also accommodates the reluctance of federal courts to interfere in pending state prosecutions.

4. Judge Smith plays a singular role in this drama, since he, and not defendant Thompson, took the active hand in reinstituting the Wilson prosecution.

5. The complainant undoubtedly has an appropriate interest in the status of a prosecution he or she has initiated. Although such an interest may not be cognizable legally, a prosecuting authority sensitive to this interest hardly can be criticized for its responsiveness.

6. On remand, the district court could properly inquire into the validity and viability of Wilson's state tort claim, since even if the first amendment protects a sham lawsuit, a right to file a meretricious action should be properly weighted in determining the equities in a particular case.

on the part of Thompson that undercuts the propriety of this course of action. In this litigious age, however, I am sure public officers commonly are faced with similar situations in which adversaries employ the criminal, as well as the civil, justice system

7. This ploy could properly be analogized to extortion, and I, of course, do not condone it. The virtue of such action, however, is irrelevant for present purposes. What is relevant is that a negative perception of this action should not place a prosecutor in a difficult position between vindicating the state interest in a viable criminal prosecution and having to defend a § 1983 action.

8. The trial court in this case appears to have discerned this distinction. He remarked during his oral decision:

> Further, I am not persuaded that the named defendant was doing anything more than he would do if some other—that the named defendant was not, himself, attempting to influence the posture or the psychology of the civil action brought by the plaintiffs in this case.

to adjust their differences,[7] and it is crucial that the possibly improper motive of a complaining witness not be imputed to the public officer.[8] *See Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977).

. . . . .

Now, having said what I have, I must say that I have seen, just in the relatively short time that I have been on this bench, what appears to be almost a pattern of where law enforcement officers make what you might call rough arrests, that technical charges of battery are brought against the arrestees . . . . I have found what appears to be almost a pattern of where there are such arrests, the arresting officers bring charges of battery against those arrested for the purpose, it appears to me, of sort of thwarting or acting as a prophylatic [sic] against the bringing of civil rights suits.

I'm not sure this is a situation or not.