Quinton David PALMER, by next
friend, Marie Palmer,
Plaintiff-Appellee,

v.

Roger HALL, et al.,
Defendants-Appellants.

No. 74–3272.

United States Court of Appeals,
Fifth Circuit.

Aug. 15, 1975.

Rehearing and Rehearing En Banc
Denied Oct. 3, 1975.

Lawton Miller, Manley F. Brown, H.
T. O'Neal, Jr., Lamar W. Sizemore, Jr.,
Macon, Ga., for defendants-appellants.

Kyle Yancey, Atlanta, Ga., for plaintiff-appellee.

Before COLEMAN, MORGAN and
CLARK, Circuit Judges.

COLEMAN, Circuit Judge.

Invoking the provisions of 42 U.S.C.
§ 1983, Quinton David Palmer, a black
male, twelve years of age when shot by
a Macon policeman while fleeing from
the scene of a misdemeanor, sued the
officer who shot him, the other officer
who was in the vicinity, the Mayor, and
the members of the Macon City Council.
A trial to the Court without the intervention of a jury, resulted in the exoneration of all defendants except the Mayor

and the policeman who inflicted the wound.

The Mayor was not present at the scene and knew nothing of the incident until after it had occurred.

There was joint and several judgment for the plaintiff for $35,000 actual damages and $15,000 punitive damages.

We affirm as to the police officer but, for reasons hereinafter set forth, the judgment against the Mayor will be reversed.

The District Court wrote an extended, detailed opinion. Its version of the shooting is supported by substantial evidence. We quote it as written.

*Facts*

"February 18, 1973

"Police Officer Roger Hall, with the Macon Police Department since 1969, and Police Officer Larry Foster were patrolling together on Sunday afternoon, February 18, 1973. Defendant Hall was driving. Around 5:00 p. m. they stopped to eat and about 5:36 p. m. they overheard radio instructions to another car to go to Appleton and Progress Streets on a code signal 10 which was shooting, colored males with rifles. Since they were close by, Officers Hall and Foster volunteered to take the call and after doing so proceeded about one-half block to Progress Street.

"Officer Hall was still driving. He turned the police car to the right onto Progress at a speed of about 25–30 m.p.h. As he turned the corner he saw three males standing about one hundred fifty yards away at the corner of Progress and Appleton with rifles pointed upwards. Defendant Hall accelerated the car, and the three males broke and ran up on the railroad tracks. The officers drove down Progress to Appleton and as soon as they turned right, parked on Appleton near the railroad tracks, jumped out of the police car and gave chase, Officer Hall going after the plaintiff who had run up on the tracks and in a westerly direction and Officer Foster going after the plaintiff's two companions who had run up on the railroad tracks and in an easterly direction. As he chased, Officer Foster withdrew his .357 Magnum pistol from his holster and the circumstances indicate Officer Hall did the same.

"The police officers saw the three males run up onto the tracks. It was late in the day, dusk was approaching, and visibility was poor. Plaintiff, a tall twelve year old Negro boy was wearing a heavy coat and was running down the railroad tracks. He did not have a hat on and with both hands he held a Daisy air rifle in front of him as he ran. The Daisy air rifle in question is what is commonly known as a 'BB gun'; it has a brown plastic stock, a brown plastic grip, a black frame and barrel and a total overall length of thirty-two inches. The 'BB gun' in question has a carbine type hand operated lever that is used to pump the gun preparatory to shooting one 'BB'.

"When Officer Hall reached the top of the path and the tracks and first saw the plaintiff running down the tracks, the plaintiff according to Officer Hall was then some 60 to 100 yards away. According to Officer Foster who could hear but not see what went on, Officer Hall twice yelled, 'stop, drop the rifle'. The plaintiff did not stop. When Officer Hall was within some 40 yards of the plaintiff and he and the plaintiff were both running in a westerly direction, according to Officer Hall the plaintiff 'looked back' at him in such a manner as to cause the barrel of the 'BB gun' to turn towards him. When he saw the barrel of the gun come around, he fired his .357 Magnum revolver. The bullet entered the rear of plaintiff's left leg about half-way between the back of the knee and the lower portion of his buttocks at a point somewhat towards the inside portion of his left leg. It exited about four inches above the top of the knee cap and several inches toward the inside of the front of the left leg.

"Officer Hall had presumed that what he saw in the plaintiff's hand was a rifle. As far as he then knew the plain-

tiff had been doing nothing more than shooting a rifle in the city which he also knew was a misdemeanor. While he had heard of Mayor Thompson's 'shoot to kill" and 'shoot first and ask questions later' orders, he says he shot only because he was in fear of his life.

"The plaintiff agrees with the officer's description of his running down the tracks but says that he did not hear the officer order him to stop and did not even look back at the officer. He denies in any way pointing his 'BB gun' towards Officer Hall. He says that he first knew that the officer was behind him when he heard the explosion of the gun and felt the bullet enter his leg.

"According to the Gunner's Bible by Bill Riviere, 1973 Revised Edition, the .357 Magnum handgun that Officer Hall fired is second in the handgun power field and has a muzzle velocity of more than 1410 feet per second.

"The path of the bullet—entered the rear and towards the inside of plaintiff's left leg and exited the front and towards the inside of plaintiff's left leg—shows that at the time the bullet entered plaintiff's body, plaintiff's body was positioned so that the toes of both feet were away from Officer Hall and the heel of each foot was towards Officer Hall; plaintiff's direction of body travel was straight ahead and away from Officer Hall; the entire rear of plaintiff's body was towards Officer Hall. Since Officer Hall was some 40 yards or 120 feet away from plaintiff when he fired his .357 pistol and since the bullet traveled at a speed of at least 1410 feet per second, plaintiff could not have moved or changed his body position to any extent in the less than one-tenth of a second that it took the bullet to travel to him. The court therefore finds that at the time Officer Hall fired his .357 pistol at the plaintiff, the rear of plaintiff's body was towards him—Officer Hall was looking at plaintiff's back.

"After he was shot the plaintiff felt pain, saw blood running down his leg and fell on to the tracks near the westerly end of the bridge. Officer Hall came up, saw the plaintiff and his condition and immediately used his belt to stop the bleeding. Officer Hall saw that plaintiff's gun was a 'BB gun'; Officer Foster ran up, observed that the plaintiff had been shot, grabbed the 'BB gun' and went to the patrol car to call an ambulance. Officer Hall picked up David Palmer and ran with him to the patrol car. The plaintiff was then carried by ambulance to the emergency room of the Macon Hospital which is about one-half mile away. After going to the emergency room, Officers Hall and Foster charged plaintiff David Palmer as a juvenile with shooting in the city and aggravated assault. According to Officer Hall the charges were from evidence at the scene—the 'BB gun' and a paper bag containing robins, the latter having been found after the plaintiff was shot. Officer Hall knew that aggravated assault was a felony."

[At this point the opinion describes the injuries sustained by Palmer].

### Officer Hall

The officer testified that he fired only because Palmer started turning the BB gun (which he thought was a rifle) toward him and from appearances he reasonably thought that his life was in danger. The Court rejected this theory of the occurrence, which, upon substantial contradictory evidence, was its prerogative as the trier of the fact. It found Officer Hall liable in that he

(1) knowingly shot and wounded Palmer, who, at most, was only a fleeing misdemeanant;

(2) was acting under color of law; and

(3) thereby denied and deprived Palmer of liberty without due process of law.

■■ Considering the available credibility choices, appellate interference with this finding is unwarranted. Given the facts as found by the District Court, we find no legal basis for upsetting the award of punitive damages.

### Mayor Thompson

Although, as already stated, Mayor Thompson was not at the scene and played no role in this regrettable occurrence, the Court found that by orders, statements, and utterances made at other times and places "Mayor Thompson just as much as Officer Hall, caused the plaintiff to be shot, and he is liable under 42 U.S.C. § 1983 the same as Officer Hall is". Obviously, for the Mayor to be liable under this theory it would be necessary for the preponderance of the evidence to show that his utterances proximately caused or contributed to causing the actions of the officer. Our appraisal of this record leaves us convinced that this finding fails for want of substantial evidentiary support.

The complaint sued Mayor Thompson, as follows:

"The defendant Ronnie Thompson, in his position as Mayor, had on numerous occasions adopted, urged and advocated upon the policemen of the City of Macon a 'shoot to kill' policy, and by proclamations, statements and conversations had conveyed to the policemen, including the defendants ROGER HALL and LARRY FOSTER herein, the erroneous impression that they had the legal authority not only to apprehend persons suspected of crime but also actually had the authority to execute persons suspected of the commission of crime."

In his brief, counsel for appellee states:

"Thus the question is one of causation. Did the 'shoot to kill' orders of Thompson as acting Chief of Police cause or contribute to the shooting of the plaintiff?"

The Court heard testimony *in extenso,* including the deposition and live testimony of the Mayor, as to what the Mayor had said at various times and places over the years following his assumption of office in 1967. This included an official order which the Mayor issued to the Chief of Police on June 19, 1970, two years and eight months before the shooting:

"CITY OF MACON
Georgia 31201
"June 19, 1970

### "EXECUTIVE ORDER

"FROM: MAYOR RONNIE THOMPSON

"TO: CHIEF J. F. FLYNT

"As you know we are receiving more and more threats from a few dissenting people who are interested only in violence.

"People engaged in burning, looting, killing and the destruction of property, etc. must answer to the strongest reply available.

"Lawlessness designed to produce anarchy and the destruction of the City of Macon will not be tolerated.

"No policeman, no volunteer policeman will be asked to face the enemy unarmed. See that we have sufficient arms, ammunition and equipment.

"Those people engaged in lawlessness and anarchy must be stopped. SHOOT TO KILL!

s/ Ronnie Thompson
Ronnie Thompson, Mayor"

The television and newspaper statements of the Mayor vigorously, possibly intemperately, denouncing rioting, burning, crimes of violence, and civil disruption, certainly in some instances, went beyond the scope of his lawful authority as Mayor.

■■ The brief for Palmer correctly concedes, however, that he may not recover damages from the Mayor merely for making statements, however unreasonable. They had to cause or contribute to causing Officer Hall to shoot him. Palmer had the burden of proving by a preponderance of the evidence that in fact they did so. In the appellate posture there must be substantial evidence from some source that they did so.

The efforts of the plaintiff to prove the causal connection was limited solely to questions propounded to Hall and his officer companion. No other Macon po-

lice officer, or any other person, was called to testify on this point.

We quote verbatim the testimony [combined from various places in the record] of Hall and the other officer who was at the scene of the shooting:

### Officer Hall

"Q Did you ever attend any gathering where the mayor gave any instructions or exclaimed or exclamated on his part his philosophy about what policemen ought to do? do?

"A No sir.

"Q Did you ever read where he instructed officers to shoot to kill?

"A I heard about it.

"Q With some frequency?

"A I think it made the news.

"Q Several times?

"A I believe it did.

"Q Let me ask you whether any alleged statements that the mayor might have made, if he made any, have had any effect on your method of law enforcement?

"A No sir. I police the way I know how and the way that is best.

"Q Let me ask you this: Tell me whether or not any alleged statements of the mayor had any bearing on your method of law enforcement on the incident involving David Palmer?

"A None whatsoever.

"Q Officer Hall, you had of course read or come in contact with the Mayor's 'shoot to kill' order, hadn't you?

"A I had heard of it.

"Q Did the chief tell you about it or did you read about it in the newspaper or both?

"A Mostly the newspaper.

"Q And you read about the 'shoot first and ask questions later', didn't you?

"A That was pertaining to certain incidents.

"THE COURT: The question is 'did you read about it'?

"A The Witness: Yes, I heard about it. I didn't read it."

### Officer Foster

"Q Let me ask you this—you have heard reference about this executive order that came out from the Mayor's office in 1970. Have you ever seen that executive order?

"A Only what I saw in the newspapers.

"Q I mean you didn't see it—it wasn't published to you or anything of that nature by the Police Department?

"A No sir.

"Q Let me ask you this—whether or not any statements that have been made here in Court today allegedly attributable to the Mayor, had any effect on the way that you acted on the day in question in regard to the Palmer incident?

"A None whatsoever."

The trial court apparently disbelieved this testimony but this disbelief cannot serve as a substitute for affirmative evidence of some kind from some source that the utterance of the Mayor, or his twenty month old order, was a causative factor in the unfortunate shooting.

Other than the fact that the statements had been made, we find no testimony in this record that they caused Officer Hall to shoot young Palmer. Appellee cites none in his brief. The trial court cited none in its findings of fact and conclusions of law. It is simply assumed or presumed that the shooting was "a natural consequence" of the statements. Aside from the lack of evidence to support this position, it is to be noted that from the time Hall became a police officer in 1969, at the age of twenty one, until this incident he had never fired a gun at or toward an individual.

As unwise and as intemperate as they may have been, we hold that this

record is bereft of substantial evidence that the statements of the Mayor had anything to do with the shooting of David Palmer.

The judgment as to Roger Hall is affirmed.

The judgment as to Mayor Thompson is reversed and the cause will be remanded so that the complaint as to him may be dismissed.