Samuel C. PIZZOLATO

v.

Leander H. PEREZ, Jr., et al.

Civ. A. No. 79–3601.

United States District Court,
E. D. Louisiana.

Sept. 4, 1981.

George M. Strickler, Jr., Ann Woolhandler and Michael G. Collins, New Orleans, La., for plaintiff.

W. Eric Lundin, III, New Orleans, La., for Mary & Luke Petrovich, Sink and Jurjevich.

Gilbert V. Andry, III, Asst. Dist. Atty., 25th Judicial Dist. Ct., Parish of Plaquemines, State of Louisiana, Pointe-a-la-Hache, La., for Perez.

OPINION

ARCENEAUX, District Judge.

This action, brought pursuant to 42 U.S.C. §§ 1983, 1985(2), 1985(3) and 1986, came on for trial on March 26, 1981. The parties submitted post-trial memoranda. Having considered these materials, the testimony and the applicable law, IT IS ORDERED that:

1. The pending state prosecution of plaintiff be permanently enjoined; and,

2. Compensatory damages in the amount of $10,000.00 and punitive damages in the amount of $10,000.00 are owing to plaintiff from defendants Petrovich and Jurjevich, for those violations of plaintiff's constitutional rights, all as more fully set forth below.

*Preface*

Plaintiff alleges that his criminal prosecution on state voting law charges, now pending in the Twenty-fifth Judicial District Court for Plaquemines Parish, constitutes a bad faith prosecution by the District Attorney, Leander Perez, Jr. This prosecution is the result, plaintiff contends, of a conspiracy between defendant Perez and the other defendants, in an attempt to harass and retaliate against him for his opposition to the defendants' political organization. Defendants are also motivated, plaintiff claims, by his refusal to settle, on terms favorable to defendants, an allegedly politically-motivated civil suit for damages filed against him by the defendants. Plaintiff seeks an injunction against defendant Perez, prohibiting plaintiff's prosecution on the state criminal charges, and damages against the remaining defendants.

*The Parties*

1. Defendant Leander Perez, Jr. is the District Attorney for the Twenty-Fifth Judicial District, a position he has held since 1960. Defendants acknowledge that Mr. Perez has been active in Plaquemines Parish politics for many years.

2. Defendant Luke Petrovich is the Commissioner of Public Safety for Plaquemines Parish, and has held that position since 1961. He is the brother and attorney of an original defendant, Mary Petrovich Russell Sinks (since deceased), and a close friend and attorney of defendant Leander S. Jurjevich.

3. Leander S. Jurjevich has been an employee of the Plaquemines Parish Commission Council since 1969, working under the supervision of defendant Luke Petrovich. He has served on occasion as a Poll Commissioner and, on June 25, 1977, was a Poll Commissioner in Plaquemines Parish, Ward 3, Precinct 2.

4. Mary Petrovich Russell Sinks (Ms. Sinks), named as an original defendant, died prior to trial of this matter. Ms. Sinks worked for the Plaquemines Parish Commission Council as a secretary for many years before her death, under the direction of her brother. She had also served as a Parish Poll Commissioner and, on June 25, 1977, was a Poll Commissioner in Plaquemines Parish, Ward 3, Precinct 3.

5. Samuel C. Pizzolato, the plaintiff, is an independent oilfield contractor and boat owner. He was Chairman of the Board of Supervisors of Elections for the Parish of Plaquemines and served as a Poll Commissioner for Elections on numerous occasions. He sought public office on three occasions—State Representative, Constitutional Convention Delegate and Democratic Executive Committee member. He founded and was Chairman of the Plaquemines Parish Loyal Democrat Organization, which organization was made up of supporters of the National Democratic Party. His political opposition to Mr. Luke Petrovich has included political

speeches and radio broadcasts critical of Petrovich. As both parties concede, Mr. Pizzolato has been for many years a political adversary of defendant Leander H. Perez and his family and their political supporters.

### Background

In October of 1976, an election was conducted in the First Congressional District (consisting of the parishes of Plaquemines, St. Bernard and part of Orleans). Mr. Rick Tonry won that race, but subsequently resigned amidst charges of vote fraud. An offshoot of that disputed election was a libel action filed in the Twenty-Fifth Judicial District Court by 68 election commissioners against numerous defendants, including Pizzolato. He, in turn, exerted a counterclaim against plaintiffs and their attorney, Luke Petrovich. Among the plaintiffs were Mary Russell Sinks and Leander Jurjevich. The complaint in the libel action alleged that defendants had published allegations that vote fraud had occurred in Plaquemines Parish and that these allegations had libeled all the election officials working in the October election. The matter was removed to federal court and was pending as this case went to trial.

As a result of Mr. Tonry's resignation, a special primary election was held on June 25, 1977 in the First Congressional District. In this election, plaintiff was a campaign worker for Mr. Tonry and was selected by the Board of Election Commissioners to work as an election commissioner in the primary. He volunteered to work in Ward 3, Precinct 3, in Buras, Louisiana (not his home polling place), because there would not otherwise be a Tonry supporter working in that polling place. Ms. Sinks had also been assigned to that poll.

Because both Democrats and Republicans used the same machines to cast votes for their respective candidates, the machines had to be "set" for each voter, so that a registered Democrat could not vote for a Republican candidate and vice versa. Prior to the election, election commissioners recognized the possibility that a machine could

be inadvertently incorrectly set, thus preventing the voter from voting for his party's candidate. The commissioners decided that, if this occurred, an election commissioner of the appropriate party would enter the machine and cast his own vote, thus making it possible to reset the machine for the voter.

At approximately 11:30 a. m. on election day, a machine in Ward 3, Precinct 3, was set incorrectly. Margaret Kleinpeter, the wife of one of that precinct's election commissioners and a registered Republican, entered a machine to vote. Mrs. Kleinpeter called out from inside the curtain that she could not cast her vote and exited the machine, leaving it ready to register a Democrat's vote. She was then directed to a machine set for a Republican. At this point, there is some conflict in the testimony as to who said what. Pizzolato indicates that Mr. Kleinpeter said, "It's set for a Democrat, Sam, you go in and vote". Kleinpeter testified that it was Pizzolato who suggested that he, Pizzolato, vote. It is not disputed, however, that plaintiff then entered the machine and cast a vote, despite the fact that he was not registered to vote in that precinct. Upon exiting the machine, Pizzolato indicated that he had made an error in voting in that precinct. Kleinpeter testified that he and Pizzolato realized at the same time that a mistake had occurred; i. e., as Pizzolato exited the machine. As Kleinpeter described it:

> You would have to actually been there. It's hard to describe. You know, your mind plays tricks on you, or mine does frequently, and it was as if we both got the same . . . arrived at the same conclusion at the same time. We were standing very closely. And it might have been me who did it rather than Sam, and it was very evident to me that when he . . . that he did it unintentionally. That is, he forgot momentarily that he was not a voter at the precinct and in that ward. Unfortunately, until after he pulled the trigger . . . and we both realized it almost immediately that he had done it the wrong way. I just . . . it was to me at

that time it was ... it wasn't going to be that big a deal, but it turned out to be. (Transcript 103).

Pizzolato then immediately announced that he wished to sign an affidavit and Ms. Sinks wrote the following on a blank sheet of paper "11:50 A.M. 6–25–77 Samuel J. Pizzolato voted in 3–3 Machine # 15471". Kleinpeter wrote on the back of the paper "voted in error by confusion". All the commissioners, including Pizzolato, signed the paper, and it was placed in the election paraphernalia.

After this occurrence, Mrs. Sinks phoned Luke Petrovich and told him what happened. This action was allegedly precipitated by Ms. Sinks' experiences with the previous election, relative to the allegations of vote fraud. Petrovich came to the poll and, according to plaintiff, accused Pizzolato of vote fraud. Petrovich then left the polling place.

Later that day, Pizzolato left the Buras poll (Ward 3, Precinct 3), and went to his home precinct in Boothville (Ward 3, Precinct 2) and again cast a vote. He mentioned to several acquaintances that he had, by mistake, voted in Buras. Defendant Jurjevich, a commissioner at the Boothville poll, called defendant Sinks with this information, which Ms. Sinks then relayed to Petrovich.

Later that day, Petrovich prepared a set of typed affidavits for all commissioners, except Pizzolato, to sign. Commissioners Pelas, Sercovich, Kleinpeter and Sinks signed these affidavits, which stated that Pizzolato had voted in a precinct other than the one in which he was registered and that he had been absent from the poll several times during the day. Petrovich then proceeded to the Boothville poll and asked the commissioners there to sign the affidavit he had prepared, which affidavit stated that Pizzolato had voted in that precinct. Defendant Jurjevich and two other commissioners signed the affidavit. Plaquemines Deputy Sheriff Martinez, who had driven Petrovich to Boothville, prepared a "Supplementary Investigation Report" which recounted his receipt of two complaints from Petrovich concerning Pizzolato voting twice. This report was filed in the office of District Attorney Leander Perez.

Inasmuch as Pizzolato was present at the Buras poll when Petrovich arrived with the affidavits he was aware that an "investigation" was underway relative to the voting incident. He then called the Federal Bureau of Investigation ("F.B.I.") that evening to report the incident and request an investigation. He was, four to five days after this incident, interviewed by F.B.I. agents.

On the Monday following the Saturday primary, defendants Petrovich and Jurjevich and Deputy Martinez drove to New Orleans and met with U.S. Attorney Gerald Gallinghouse to complain about Pizzolato's actions. Copies of the affidavits were given to Gallinghouse and the F.B.I. investigated the matter. On July 15, 1977, the U.S. Attorney's Office declined to prosecute the matter, finding:

Even though it is evident that Pizzolato cast two votes during this election, it is unlikely that any criminal intent could be proved. He made no effort to conceal his mistake and there is no evidence to support a finding that he intentionally cast a fraudulent vote or deprived citizens of their civil rights.

For these reasons, we are closing our files on this matter and request no further investigation.

(Rpt. of Irving Warshauer, Asst. U.S. Atty., July 15, 1977, Pl. Ex. # 3).

Except for the June 25 investigative report of Deputy Martinez, no further state or local action was taken against Pizzolato relative to this matter for two years.

On the evening of June 21, 1979, Petrovich called the District Attorney, defendant Perez, and asked what action that office intended to take in the matter, inasmuch as the two-year prescriptive period was about to run. Perez told Petrovich to have his clients (Sinks and Jurjevich) appear as prosecution witnesses before the Justice of the Peace, swear out a complaint, and meet with Assistant District Attorney Mr. Frank

Klein. This meeting occurred the next morning, on June 22, 1979, and subsequently Klein filed a Bill of Information against Pizzolato for vote fraud, which charge was a felony under the then-existing state statute.

It is at this point, plaintiff claims, that the bases of the claims exerted in this matter and the civil action filed by the 68 election commissioners (*Ragas v. Davis*) become intertwined. Petrovich, who in the spring of 1979 was the sole attorney representing those 68 plaintiffs, approached Pizzolato's attorney in that matter, one Joseph Defley, with a settlement proposal. Defley relayed the proposal to Pizzolato and another defendant in that matter, whom he also represented, both of whom rejected the settlement offer. On June 20, 1979, Defley conveyed this rejection, by certified letter, to Petrovich. This Court finds that this letter was received by the office of defendant Petrovich on June 21, 1979. This finding results, despite Petrovich's testimony that he did not think he first saw the letter on June 21, and could not say when he did see it, from the following indicia of receipt:

1) the certified receipt tab shows the first notice of receipt as June 21, 1979. The date of July 6, 1979, which Petrovich testified was indicative of receipt, was the *return* date (i. e., the date on which the post office would have returned the letter to Defley had it not been claimed); and,

2) the original of the letter is stamped "Received June 21, 1978" by a stamp Petrovich identified as the one used by his office, which stamp was obviously mistakenly set for 1978 instead of 1979.

It was on June 21, 1979 that Petrovich called defendant Perez to discuss the prescription issue relative to the incident of July 25, 1977. On the evening of June 23, Pizzolato was arrested and subsequently released on his own recognizance.

In late July or early August, Mr. Defley filed a motion to recuse the state judge to whom the criminal case had been allotted. Defley testified about a conversation he had with defendant Perez incident to that motion:

... I went to see Mr. Perez in his office, and I told him I thought this was a garbage case, and I asked him to dismiss it. I said there was no intent to commit fraud here. He said he could not dismiss this case because it was his understanding that there was a civil action pending, and that the civil action had to be completed, disposed of before he would take care of this case, dispose of this case.

Q. To your knowledge was there any civil action pending regarding Mr. Pizzolato except for *Ragas v. Davis*?

A. None, none whatsoever. Mr. Perez also advised me that the action on the criminal matter, that there would be no problem withholding any further proceedings in the criminal matter until the civil matter was disposed of.

(Transcript 119–120).

At the time of the trial of this matter, the state criminal charges against Pizzolato relative to the voting incident remained open, though the U.S. Attorney's report, quoted above, indicates that the matter was not being pursued by that office.

The opposing parties' explanations for the actions which brought about this complex and bizarre sequence of events are important to the legal analysis of plaintiff's claims. Defendant Petrovich testified that he was motivated by a desire to protect his clients, Sinks and Jurjevich, from charges that they, as election commissioners, might be somehow responsible for Pizzolato voting twice. Defendant Perez testified that during the two years between the incident and the prosecution, the voting error "was always in my mind" and that he was "watching closely the prescription date". This purported concern was obviously never communicated to anyone, and Perez testified that he conducted no prosecution because he had no formal complaint about the matter. The suggestion was also made by counsel for the defense that the conversation between Defley and Perez, in which Perez allegedly told Defley the criminal matter could be put in abeyance once the pending civil case was settled, occurred in

October of 1979, at the time of Pizzolato's arraignment. Thus, that conversation referred to *this* case, rather than *Ragas*.

Plaintiff claims that defendants were merely motivated by a desire to harass him for his political opposition and were finally prompted to do so by his refusal to settle the *Ragas* case on their terms. Consequently, in retaliation, they conspired to file the criminal charges which were the catalyst for this litigation.

### Factual and Interpretive Findings

This Court finds that a conspiracy did exist among the defendants. This finding arises from the facts set forth above and the conclusions which they mandate.

This Court is not convinced that Sinks and Jurjevich feared being prosecuted themselves as a result of the voting incident of 1977. The results of the June 1977 primary were never challenged, and no suggestion of wrongdoing on the part of the election commissioners was ever made by anyone.

Defendant Petrovich admitted that he did not make a single contact with any other law enforcement official until his call to Perez on June 21, 1979, and that he was then aware that the United States Attorney was not going to investigate the matter further. As a result of his legal background, Petrovich must have also been aware that no state prosecution would begin without the filing of a formal complaint.

This Court has already found as a matter of fact that the Defley letter rejecting the settlement offer by Petrovich on behalf of his clients was received by Petrovich's office on June 21, 1979. This Court does not believe that, after a two-year lapse, it was mere coincidence that Petrovich called Perez about Pizzolato on the evening of June 21, 1979. This Court also does not believe that Mr. Petrovich would jeopardize a settlement proposal which was allegedly still on the table (assuming Mr. Petrovich had *not* seen the letter by June 21) by having his clients file criminal charges against Pizzolato.

Nor is the Court convinced by the explanation offered by defense counsel of Perez' conversation with Defley. Defley emphatically stated that his conversation with Perez occurred in July or August of 1979—i. e., before the instant suit had been filed. The complaint in this matter, filed in September of 1979, alleges that, on August 6, 1979, plaintiff's attorney in the state court case, Mr. Defley, had the conversation testified to by Mr. Defley with Mr. Perez. It is not within the realm of possibility that plaintiff's counsel in this case would have alleged a conversation that was yet to take place. Thus, defendant's suggestion that this conversation arose in October and was relative to *this* litigation is rejected.

### Law

It is well settled that, absent extraordinary circumstances, principles of comity and federalism mitigate against federal court intervention in a pending state criminal prosecution. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The exception to this general rule arises where plaintiff makes a showing of either bad faith or harassment by the state authorities who are pressing the prosecution; *Moore v. Sims*, 442 U.S. 415, 432, 99 S.Ct. 2371, 2381–2382, 60 L.Ed.2d 994 (1979); *Perez v. Ledesma*, 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1971); *Kolski v. Watkins*, 544 F.2d 762 (5th Cir. 1977); *Wilson v. Thompson*, 593 F.2d 1375, 1381 (5th Cir. 1979); *Shaw v. Garrison*, 467 F.2d 113, 120 (5th Cir. 1972), *cert. denied*, 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972); *Stewart v. Dameron*, 448 F.2d 396 (5th Cir. 1971); *Duncan v. Perez*, 445 F.2d 557, 560 (5th Cir. 1971), *cert. denied*, 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 254 (1971).

The *Younger* doctrine is premised upon the assumption that "ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights". *Kugler v. Helfant*, 421 U.S. 117, 124, 95 S.Ct. 1524, 1531, 44 L.Ed.2d 15 (1975). A good faith prosecution cannot constitute ir-

reparable harm merely because the individual subject to the prosecution undergoes inconvenience, anxiety and expense, *Douglas v. City of Jeannette*, 319 U.S. 157, 164, 63 S.Ct. 877, 881, 87 L.Ed. 1324 (1943), inasmuch as "no citizen . . . is immune from prosecution in good faith, for his alleged criminal acts". *Younger, supra*, at 46, 91 S.Ct. at 751, quoting *Beal v. Missouri Pacific R.R. Corp.*, 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941).

If, however, the element of bad faith or harassment exists, the above presumptions cease to operate. The effect of showing of a bad faith prosecution is equivalent to a showing of irreparable injury. *Wilson v. Thompson, supra* at 1382.

The guises under which bad faith prosecutions appear are many. *Perez v. Ledesma, supra* at 117, 91 S.Ct. at 693. There are four major forms which have been distinguished by the courts, however. *Davila v. State of Texas*, 489 F.Supp. 803, 808–809 (S.D.Tex.1980). One such form occurs where prosecution is brought under a valid statute in an attempt to retaliate for a federal plaintiff's exercise of constitutional rights. *Heimbach v. Village of Lyons*, 597 F.2d 344 (2d Cir. 1979); *Wilson v. Thompson, supra* at 1382 n.7. A second type of bad faith harassment occurs when a serious prosecution is undertaken for a relatively minor offense, and is coupled with a selective process arising in an atmosphere of political and/or racial hostility. *Sobol v. Perez*, 289 F.Supp. 392 (E.D.La.1968); *Duncan v. Perez, supra*. Another type of bad faith prosecution occurs where the prosecution is brought under a valid statute but with no reasonable belief that a conviction will follow. *Perez v. Ledesma, supra* at 118 n.11, 91 S.Ct. at 693 n.11; *Kugler v. Helfant, supra* at 126 n.6, 95 S.Ct. at 1531 n.6. It is not required in this circuit, however, that a showing of "an unquestionable legal bar" to prosecution be made prior to a finding of bad faith. *Jarvis v. Knowlton*, 459 F.Supp. 687, 691 (N.D.Tex.1978); *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981). The final form of recognized bad faith prosecution arises when the prosecution is motivated by a desire for personal and political gain, which prosecution evidences some degree of impermissible selectivity, even though taken pursuant to a lawful statute. *Shaw v. Garrison, supra.*

The facts of this case indicate that a bad faith prosecution has occurred here, and that the prosecution contains some elements of all of the modes cited above. In its most compelling shape, however, it arose in retaliation for, and to discourage, the exercise by plaintiff of his constitutional rights. Plaintiff, in filing his counterclaim in the *Ragas* case and in refusing to settle same, was engaged in constitutionally protected conduct. Access to the courts is protected by the first amendment right to petition for a redress of grievances. *Wilson v. Thompson, supra* at 1387; *N.A.A.C.P. v. Button*, 371 U.S. 415, 429–430, 83 S.Ct. 328, 335–336, 9 L.Ed.2d 405 (1963); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

The retaliatory and/or deterrent nature of the prosecution is indicated by the conversation (the occurrence of which was never controverted by defendant Perez) between Perez and Mr. Defley. Perez indicated that he would not drop the criminal prosecution until the civil matter in which plaintiff was involved (i. e., *Ragas*), was terminated. His willingness to delay the prosecution pending resolution of the *Ragas* matter is further indication of his readiness to wield his prosecutorial powers to bring about a chilling of plaintiff's exercise of his first amendment rights.

There are numerous factual similarities between this case and the setting in *Wilson v. Thompson, supra*. There, the federal plaintiffs had previously been charged with misdemeanors in state court. They brought suit, under Section 1983, alleging that the once-dormant state prosecution was re-activated in bad faith, so as to deter them from seeking redress of grievances. The Fifth Circuit reversed the lower court's denial of a preliminary injunction as to the state prosecutions and applied the following test for determination of whether "bad faith" had occurred:

The Court should consider whether the plaintiffs have shown, first, that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected, and, second, that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct. If the court concludes that the plaintiffs have successfully discharged their burden of proof on both of these issues, it should then consider a third: whether the State has shown by a preponderance of the evidence that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered.

*Wilson, supra* at 1387.

The Court went on to state that factors pertinent to the third consideration were whether the state prosecution was undertaken without hope of a valid conviction and the seriousness of the criminal activity alleged.

As indicated by the foregoing discussion, this Court considers plaintiff to have borne his burden in proving the first and second parts of the aforementioned three-part test. It is not convinced, however, that the State has shown by a preponderance of the evidence that it would have reached the same decision to prosecute had the impermissible purpose not been considered. The testimony of defendant Perez leads this Court to the conclusion that he would have taken no action in the criminal matter without the impetus of Petrovich's June 21st phone call. It was uncontested that, in the period between August 1977 and June 21, 1979, no action had been taken on the state or federal level relative to the allegedly fraudulent voting incident. Furthermore, defendant Perez knew then, and certainly knows now, the questionable basis for the state prosecution. The significance of the activity, and the reasonable expectation of conviction are, in light of the circumstances surrounding the occurrence, minimal.

As stated in *Kugler v. Helfant, supra* at 126 n.6, 95 S.Ct. at 1531 n.6, "bad faith in [the *Younger*] context generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction". The standard governing plaintiff's showing of the unlikeliness of the prosecution's success is a flexible and realistic one, *Jarvis v. Knowlton, supra,* and plaintiff need not prove that the prosecution could not possibly result in a conviction. *Fitzgerald v. Peek, supra* at 945.

The incident resulting in plaintiff's arrest was promptly investigated by the federal authorities. Their findings convinced them that the matter should not be pursued. Since that time, no new facts have been discovered, nor has any subsequent investigation been made.

This Court has found evidence of improper motivation. The element of selectiveness is also apparent in that the other election commissioners present at Buras and Boothville could have been charged with the second of the two counts entered against plaintiff—i. e., the action taken, as an election commissioner, in counting a fraudulent vote. No such charges were brought against anyone other than plaintiff.

While defendants make much of the fact that plaintiff is charged in the criminal prosecution with a felony, the gravity of this fact is mitigated by the unlikelihood of finding criminal intent, given the strange chain of events surrounding the voting fraud incident. *Duncan v. Perez, supra* at 560. While the charges pending against the plaintiff are now punishable at a maximum of six months each, defendant Perez seeks to prosecute him under the statute in effect at the time of the incident. That prior statute treats these allegations as punishable by up to four years imprisonment. *See Duncan v. Perez, supra* at 559 n.3 (maximum penalty sought for trivial offense is a factor to be considered in a determination of bad faith). Relative to defendant Perez's current knowledge of the circumstances surrounding this matter, his continued pursuit of this prosecution is, itself, an indication of a bad faith prosecution which should be enjoined. *Wilson v. Thompson, supra* at 1388 n.23 (noting that subsequent discovery by prosecution of its mistaken factual basis may be a ground for injunctive relief).

Plaintiff has therefore established to this Court's satisfaction that a bad faith prosecution occurred. Where the *Younger* doctrine is inapplicable, the Anti-Injunction Act, 28 U.S.C. § 2283 does not bar an injunction. Accordingly, the lower court's prosecution of plaintiff on the criminal charge described above is to be enjoined. *Henry v. First National Bank of Clarksdale*, 595 F.2d 291, 300 (5th Cir. 1979); *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

Defendant Perez is immune from damage liability in a suit under Section 1983, since the acts complained of were within the scope of his duties as district attorney. *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Henzel v. Gerstein*, 608 F.2d 654 (5th Cir. 1979). Plaintiff seeks damages from the two remaining defendants, Petrovich and Jurjevich, based upon his allegations that they acted in concert with the prosecutor in bringing about the bad faith prosecution. Conspiracies to deprive one of his constitutional rights are actionable under Section 1983, and a showing of class-based discrimination is not a prerequisite to liability. *Mizell v. North Broward Hospital Dist.*, 427 F.2d 468, 472 (5th Cir. 1970); *Crowe v. Lucas*, 595 F.2d 985, 990 (5th Cir. 1979).

To sustain a claim under Section 1983, plaintiff must show both a deprivation by defendant of a constitutionally secured right and that defendant acted under color of state law. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Private persons, conspiring or participating in joint activity with state officials in prohibited conduct, may be sued under Section 1983, inasmuch as they are deemed to be acting under color of state law. *Adickes v. Kress, supra* at 150–152, 90 S.Ct. at 1604–1605; *Fadjo v. Coon*, 633 F.2d 1172, 1175 (5th Cir. 1981); *Williams v. Rhoden*, 629 F.2d 1099, 1102 (5th Cir. 1980). Private individuals may be held liable for damages under Section 1983 even if they have conspired with immune state officials. *Cook v. Houston Post*, 616 F.2d 791, 794 (5th Cir. 1980), *Sparks v. Duval County Ranch Co., Inc.*, 604 F.2d 976, 983 (5th Cir. 1979) (en banc); *aff'd sub nom; Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

This Circuit has held that proof of a civil conspiracy's existence does not require direct evidence of the agreement between the conspirators. Rather, the proof of an agreement to act in concert must often rest on circumstantial evidence.

> The evidence here showed that the defendants had participated in private meetings at which [plaintiff] was discussed. From this evidence and the testimony regarding the defendants' course of conduct toward [plaintiff] the jury could reasonably have inferred that a conspiracy existed.

*Crowe v. Lucas, supra* at 993.

The Court is convinced that defendants Perez and Petrovich reached a meeting of minds relative to the manner in which the plaintiff was to be pressured into settling the *Ragas* litigation. Defendant Jurjevich shared in the general objective of defendants Petrovich and Perez, which objective was to coerce the plaintiff into a settlement of a suit in which he was a plaintiff. This shared objective constitutes the common plan; the overt acts of filing the information and initiating the prosecution constitute acts in furtherance of the conspiracy. Plaintiff was the object of discussion in the telephone conversation between defendants Petrovich and Perez, as well as in discussions between defendants Jurjevich and Petrovich. *Crowe, supra.* When these facts are coupled with the timing of subsequent events—the call to Perez following Defley's rejection of the complaint, the marshalling of "complainants" Jurjevich and Sinks, the arrest of plaintiff—strong circumstantial evidence permits this Court to conclude that a conspiracy existed between defendant Perez and defendants Jurjevich and Petrovich.

Plaintiff also brings suit under 42 U.S.C. §§ 1985(3) and 1985(2). However, as is conceded by plaintiff, since this Court has already found a violation of Section 1983 and also found conspiracy under that sec-

tion, this Court's decision may rest upon that ground, rather than the alternative Section 1985 conspiracy grounds. It is noted that this Court is not convinced that plaintiff has made out a cause of action under Section 1985(2).

This determination results from this Court's reading of *Kimble v. D. J. McDuffy, Inc.*, 648 F.2d 340 (5th Cir. 1981) (en banc). The Court referred to the four-part breakdown of 42 U.S.C. § 1985(2), which was enunciated by then-District Court Judge Alvin Rubin:

A. If two or more persons conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein . . . or

B. to injure such party or witness in his person or property on account of his having so attended or testified, or

C. if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or

D. to injure him or his property for lawfully enforcing . . . the right of any person, or class of persons, to the equal protection of the laws.

Plaintiff bases his claim under this statute upon defendants' alleged violation of the "second and third" clauses (i. e., "B" and "C" above). The Court in *Kimble v. McDuffy, supra*, held that the racial or class-based animus requirement of Section 1985(3) is fully applicable to all parts of Section 1985(2). The Court reiterated that class-based animus may arise as a result of an individual's political beliefs or associations. This Court is convinced that plaintiff was the subject of class-based animus, stemming from his political alignments, which alignments were adverse to the defendants.

However, the *Kimble* Court enunciated a very narrow construction of the "attend or testify" language appearing in "Clause B". It quoted with approval the District Court's interpretation of the phrase:

[Section 1985(2)] does not create a claim for every conspiracy entered into with intent to deny a citizen access to a court or to retaliate against a citizen for his utilization of the federal court system. If they are to come within the plain language of the statute, plaintiffs must allege that they were injured on account of having *attended* or *testified* in federal court. This they have not done . . . . At most, the conspiracy charged was aimed at injuring the plaintiffs on account of their having asserted a claim or filed a lawsuit. Congress did not undertake to make that behavior actionable.

445 F.Supp. at 276 (emphasis in original; footnotes omitted). The en banc decision then honed the meaning of this language even further:

In light of the acts of violence that threatened the sanctity of federal courts, Congress meant Section 1985(2) to protect a party based on his physical presence while attending or testifying in court.

*Kimble, supra* at 348. As a result of this interpretation of "attend or testify", plaintiff's claim under Clause B of Section 1985(2) is denied.

Plaintiff concedes that there is little jurisprudence relative to a claim brought under "Clause C", other than to recognize that it too requires a finding of class-based animus and "independent illegality". This Court is not disposed to interpret the "obstructing . . . the due course of justice language" as encompassing the violation alleged here (i. e., institution of a frivolous criminal action), and would deny plaintiff's claim for relief based upon this section of Section 1985(2).

 To establish a claim under Section 1985(3), plaintiff need not prove that the alleged wrong occurred under color of state law, inasmuch as Section 1985(3) is applicable to private conspiracies. *Scott v. Moore*, 640 F.2d 708, 717 (5th Cir. 1981); *Sims v. Jefferson Downs, Inc.*, 611 F.2d 609, 614 (5th Cir. 1980). See generally *Griffin v. Breckenridge*, 403 U.S. 88, 101–103, 91 S.Ct. 1790, 1797–1799, 29 L.Ed.2d 338 (1971).

The elements of a civil action under this section were set out in *Griffin, supra*:

(1) The defendants must conspire or go in disguise on the highway or premises of another;

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and

(3) one or more of the conspirators must commit some act in furtherance of the conspiracy; whereby

(4) another is either (a) injured in his person or property or (b) deprived of having and exercising any right of privilege of a citizen of the United States.

The Fifth Circuit has amplified on the above by the addition of the element of "independent illegality"—i. e., that the conduct complained of is unlawful, independent of the Section 1985(3) violation. *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir. 1977) (en banc).

This Court has determined that a conspiracy existed among the defendants. As set forth more fully, *infra*, the plaintiff incurred personal injury and loss as a result. The Court has also determined that defendants were motivated in their conspiratorial acts by class-based bias, relative to plaintiff's political activities. This determination was made by application of *Scott v. Moore, supra* at 720, 723, citing cases relative to classes discriminated against because of their political beliefs. *See also Kimble v. McDuffy, supra* at 347. This Court also finds that, inasmuch as the right to seek redress in the Courts, as well as the right of free association, are protected by the First Amendment, plaintiff has suffered a violation of a protected right. *Scott v. Moore, supra* at 716; *Wilson v. Thompson, supra* at 1383.

However, this Court is not convinced that plaintiff has shown an "independent illegality". Nor is it convinced that its own finding that a violation of Section 1983 occurred

provides evidence of such an illegality. As stated in *Great American Federal Savings & Loan Assn. v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 2354, 60 L.Ed.2d 957 (1979) (J. Stevens, concurring):

Neither of these sections [1983 and 1985(c)] created any substantive rights. Earlier this term we squarely held that Section 1983 merely provides a remedy for certain violations of federal rights, and today the Court unequivocally holds that Section 1985(c) 'provides no substantive rights itself; it merely provides a remedy for violation of the rights it designated: *Ante* at 2349.

This Court further finds that plaintiff has failed to prove a violation of any state law so as to satisfy the "independent illegality" requirement.[1]

The Court also questions whether the "act in furtherance of the conspiracy" (i. e., the filing of charges) is legally sufficient for *Griffin* purposes. The oft-quoted language of *United States v. Harris*, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883) describes the "acts" by which a private person can deprive another of the equal protection of the laws: "... some offense against the laws which protect the rights of persons, as by theft, burglary, arson, libel, assault or murder". *Id.* at 643, 1 S.Ct. at 612. As stated in *Scott v. Moore, supra* at 724: "But where ... force or violence is used to deprive ... workers ... of the right to freely associate ... a Section 1985(3) action will lie". *See also McLellan v. Mississippi Power & Light, supra* at 928 n.34:

We also draw support for our reading of the statute from the very nature of a civil conspiracy. In a common law tort conspiracy, unlike a criminal conspiracy, a mere combination or agreement to commit a tort is not in itself actionable. Rather, some act *which is itself a tort* must be taken in furtherance of the object of the conspiracy. *See generally* W. Prosser, *supra* note 26, § 46; Burdick, *Conspiracy as a Crime and as a Tort*, 7

1. Plaintiff alleges violations of state extortion laws, as well as the intentional infliction of emotional distress and the tort of malicious

prosecution. The Court does not find these proved.

Colum.L.Rev. 229 (1907). Section 1985(3), requiring as it does an act in furtherance of the object of the conspiracy and an injury to the plaintiff, closely tracks the elements of a common law conspiracy to commit a tort.

Thus, plaintiff's claim to redress under Section 1985(3) is not cognizable; this Court does not believe that the requisite showings of an act in furtherance of the conspiracy and independent illegality have been made.

## DAMAGES

■ Damages are available under 42 U.S.C. § 1983 for actions found to have been violative of constitutional rights, which actions are proved to have caused compensable injury. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Since the principles of tort damages apply to civil rights actions, an award of compensatory damages may encompass compensation for emotional distress. *Garner v. Giarrusso*, 571 F.2d 1330 (5th Cir. 1978); *Zarcone v. Perry*, 572 F.2d 52 (2d Cir. 1978).

Although plaintiff was not incarcerated, having been released on his own recognizance after booking, he has incurred damage "by the injury flowing from the very bringing of the state proceedings, by the perversion of the very process that is supposed to provide vindication". *Younger v. Harris, supra*, 401 U.S. at 56, 91 S.Ct. at 757 (concurring opinion of Stewart and Harlan, JJ). Plaintiff testified that the charges, though trivial, have been a constant source of concern to him and his family. This concern is rooted in his fear that, in Plaquemines Parish, he could be convicted and sentenced to a substantial jail term. Indeed, the first judge to whom plaintiff's state court case was assigned recused himself as a result of public statements he had made relative to the vote fraud incident.

Plaintiff also testified to the serious chilling effect that these charges have had on his political activity:

As an opponent of [the Perez] organization, I have been, I think by this action that they have brought against me—that some of the people in the Parish have looked upon me as some kind of wrongdoer and it has tainted me to them to the degree that my political future or my political position is strained, and I personally will have to go through a bit of soul-searching to ever serve in a poll again, or to ask any of my friends to serve in a poll again, for fear the same thing may happen to them.

Tr. 32–33.

... I fear that if ever I would make another honest error, that I could never make anyone believe that I had made two honest errors. I am having a hard enough time making people believe I made one honest error. Consequently, I don't dare serve as an election commissioner again.

Tr. 76.

Plaintiff stated that he declined to work as an election official for a friend when that individual ran for a School Board seat. Plaintiff stated that he feared his "taint" might rub off on that individual, thereby hurting his chances of success.

■ Accordingly, this Court finds that compensatory damages are owing to plaintiff from defendants Jurjevich and Petrovich in the amount of $10,000.00.

■ Punitive damages are also available for violations of those rights secured by 42 U.S.C. § 1983. *Palmer v. Hall*, 517 F.2d 705, 707 (5th Cir. 1975); *Mansell v. Saunders*, 372 F.2d 573, 576 (5th Cir. 1967). Such an award is appropriate where the violation is "willful and in gross disregard for the rights of the complaining party". *Lee v. Southern Home Sites Corp.*, 429 F.2d 290, 294 (5th Cir. 1970); see generally *Adickes v. S. H. Kress & Co., supra* at 233–234, 90 S.Ct. at 1642–1643.

This Court finds direct as well as circumstantial evidence that the defendants' actions in maintaining and pursuing the criminal prosecution of plaintiff were done willfully and in callous disregard for the rights of plaintiff. The amount of punitive damages which this Court finds to be owing is within the range of awards granted for

comparable violations. *See Palmer v. Hall, supra* (Section 1983 case; $15,000 punitive damage award); *Zarcone v. Perry, supra* (wrongful arrest; $60,000 punitive damage award).

Accordingly, plaintiff is awarded punitive damages from defendants Petrovich and Jurjevich in the amount of $10,000.00. Defendant Perez is, for the reasons set forth above, enjoined from prosecution of the criminal charges now pending against plaintiff.

Judgment shall be entered accordingly.